Edwin I. Aimufua, Esq., SBN # 186986
LAW OFFICES OF EDWIN I. AIMUFUA
17000 Ventura Blvd, Suite # 201
Encino, California 91316
(818) 855-1118 (Telephone)
(818) 855-1101 (Facsimile)
eia@aimufualaw.com

*Attorneys for Plaintiffs Roseanne Hansen,*
*Jennifer Oh, on their own behalf, and on*
*behalf of all others similarly situated*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEANNE HANSEN, on behalf of herself and all others similarly situated; JENNIFER OH, on behalf of herself and all others similarly situated;<br><br><br>Plaintiffs,<br><br>vs.<br><br>SCRAM OF CALIFORNIA, INC., a California Corporation; ALCOHOL MONITORING SYSTEMS, INC., a Delaware Corporation; and DOES 1 through 10, inclusive.<br><br><br>Defendants. | Case No.:<br><br>FIRST AMENDED **CLASS ACTION COMPLAINT**<br><br>1. **Cal.Bus. & Profs. Code § 17200**<br>2. **Cal.Bus. & Profs. Code § 17500**<br><br><br>**DEMAND FOR JURY TRIAL** |

# CLASS ACTION COMPLAINT

Plaintiffs Roseanne Hansen, ("Ms. Hansen or Plaintiffs"), and Jennifer Oh, ("Ms. Oh or Plaintiffs"), (collectively "Class Plaintiffs") do bring this class action complaint against Defendants Scram of California, Inc. ("SCRAM") and their co-Defendant and manufacturer, Defendant Alcohol Monitoring Systems, Inc. ("AMS") (collectively "Defendants") on their own behalf, and on behalf of classes of individuals who have or in the past purchased Defendants' transdermal alcohol monitoring services, to seek redress from Defendants for their failure to disclose a known defect with their transdermal monitoring device which causes false-positive readings as a result of multiple environmental contaminants unrelated to the said wearer's consumption of any alcohol. The Defendants are aware of, and still aware of this defect in their own transdermal monitoring device, yet have done nothing to inform their customers of this potential defect prior to providing them the devices and charging them for the service. On behalf of themselves, others similarly situated and the proposed classes of the Defendants' customers, Plaintiffs seek damages, restitution and injunctive relief against Defendants for the false advertising of their transdermal monitoring service. For their class action complaint, Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigations conducted by their attorneys.

Plaintiffs, and the classes they seek to represent, bring this action against the Defendants to challenge the systematic defects in the products that are produced by SCRAM and AMS. At times, when a customer of SCRAM complains about the product causing injury by way of affixing the device to the customer, or about the high exuberant prices deployed by the Defendants, the employees of SCRAM are directed to file with the Court false reading violation reports that would often reflect that the customer, like the Plaintiff's consumed alcohol when in fact they haven't.  This is just one of many dirty tactics that SCRAM uses to reap the secure

benefits of stuffing their wallets with billions of dollars all while innocent people, like the Plaintiff's rot away somewhere in a jail cell.

One of the major purposes of sentencing is rehabilitation. Yet, when a person, like each of the Plaintiff's in California, is charged with a DUI related case, the Defendant will often be directed by the trial Court to wear a SCRAM ankle bracelet. To the extent that the person is ordered by the Court not to consume any form of alcohol, it substantially occurs more often than not, that a false reading is produced by the Defendant SCRAM and AMS. Some offenders in California, like the Plaintiff's was or is required to wear the SCRAM and AMS device until their criminal case is adjudicated. Coincidentally, when an offender is set to discharge from the SCRAM program, most Defendants, their attorneys, and the Court will receive a violation report just days before discharge. In a money-making scheme, the Defendants SCRAM and AMS work together to generate false reports. At the end of the day, the Defendants, which starts with AMS, then goes to SCRAM, is a report reflecting the wearer consumed alcohol when in fact they haven't.

Plaintiffs are informed, believe and thereon allege that as a result of this money-making scheme that is circumvented by the Defendants SCRAM and AMS, that each year in every County of the State of California, that thousands of clients of SCRAM are sent back to jail, prison and even having their bond revoked as a result of this money-making scheme. Regardless of whether the client is returned to custody as a result of the false violation reports, the clients of SCRAM can suffer other deprivations and consequences and as a result of the Defendants false reports. In some cases, like Ms. Hansen, Defendant SCRAM produces a false reports and the trial Court imposed an additional year of SCRAM supervision even though it was proven that Ms. Hansen had not consumed any alcohol as SCRAM and AMS filed in several violation reports to the Court. Like Ms. Hansen, thousands of other clients suffer the same catastrophic losses like the Plaintiff's.

## VENUE AND JURISDICTION

1.      This Court has jurisdiction over the state law claims asserted here that is pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

2.      This Court has personal jurisdiction over Defendants because they conduct operations and/or sales in California, are registered to do business in California, and the acts alleged herein originated in this District.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

## THE PARTIES

4.      Plaintiff is Roseanne Hansen, ("Ms. Hansen or Plaintiff's") is a citizen of the State of California, over the age of 18 years old and will be also mentioned herein at all times. At all times relevant, the injuries that were caused by the Defendants occurred in the County of Los Angeles, State of California.

5.      Plaintiff is Jennifer Ho, ("Ms. Ho or Plaintiff's") is a citizen of the State of California, over the age of 18 years old and will be mentioned herein at all times. At all times relevant, the injuries that were caused by the Defendants occurred in the County of Los Angeles, State of California.

6.      Defendant, Alcohol Monitoring Systems, Inc. is a Delaware corporation with its national headquarters located in Littleton Colorado. Defendant AMS is a nationwide provider of alcohol monitoring devices and services to state and federal law enforcement agencies, courts, as well as any and other private entities such as rehabilitation centers. Defendant AMS is registered in California and provides alcohol monitoring services in California, including in this District, and elsewhere throughout the United States.

PLAINTIFFS' FIRST AMSENDED CLASS ACTION COMPLAINT FOR DAMAGES

7.      Defendant, Scram of California, Inc. is a California corporation with its national headquarters located in Los Angeles, California. Defendant is a local distributer and provider of AMS's devices and services in this District, and elsewhere throughout California.

8.      Plaintiff's is currently ignorant of the true name(s) and the capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictious names DOES 1 through 10, inclusive, and therefore, sues such civil Defendants by such fictitious names. Plaintiff's will seek leave to amend this Complaint to allege the true names and capacities of said fictitiously named Doe Defendants is legally responsible in some manner for the events and is also sued pursuant to California Code of Civil Procedure 474.

9.      Plaintiff's is informed and believes and thereon alleges that the Defendants, including the fictitious Doe Defendants, were at all times acting as actual agents, conspirators, ostensible agents, partners and/or joint ventures and their employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy, or enterprise, and with the express and/or implied permission, with all such knowledge, consent, authorization and ratification of their own co-Defendants however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contraction with the other allegations.

10.     Whenever the Complaint refers to any act of the Defendants, the allegations shall be deemed to mean the act of those Defendants names in the particular cause of action, and each of them, acting individually, jointly and severally.

PLAINTIFFS' <u>FIRST AMSENDED</u> CLASS ACTION COMPLAINT FOR DAMAGES

## COMMON ALLEGATIONS OF FACT

11.    Defendants are providers of alcohol monitoring services and devices to state and federal law enforcement agencies, courts, as well as various private entities.

12.    The alcohol monitoring device used by Defendants is called the SCRAM Continuous Alcohol Monitoring system (the "SCRAM Device").

13.    The SCRAM Device is approximately the size of a deck of cards and is placed on the wearer's ankle using a strap. The Scram Device is a transdermal monitoring device that was designed to detect and record any instances when the wearer had consumed alcohol by detecting alcohol vapors caused by ingested alcohol diffusing through the skin.

14.    The majority of Defendants' business consists of providing alcohol monitoring services to individuals as part of court mandated rehabilitation programs, as a condition of probation or bond, or other purposes related to the criminal justice system.

15.    While Defendants are selected by state and federal agencies and courts to provide monitoring services for criminal defendants and other individuals who become involved in the criminal justice system, it is such individuals who are ultimately Defendants' customers and choose to purchase Defendants' alcohol monitoring service as an alternative form of monitoring offered by the state or federal agency or court. Defendants enter into private contracts with each such individual to provide them their alcohol monitoring services, and directly charge them a monthly fee.

16.    Defendants advertise their SCRAM Device as a cost-effective and accurate alternative for law enforcement agencies and courts to track the alcohol usage of at-risk individuals such as those charged with driving under the influence or other crimes relating to consumption of alcohol.

17.    Specifically, the SCRAM Device is meant to be worn 24/7. The wearer is instructed to once a day, connect the SCRAM Device to a special docking station connected to the internet to upload the monitoring data collected by the device throughout the day.

18.    Once the device is connected, the data is sent to a central data center in Colorado operated by AMS. There, the data is reviewed to determine if any monitoring "event" occurred that indicates that the wearer ingested alcohol.

19.    Unlike blood alcohol monitoring that directly detects the level of alcohol present in the blood stream, Defendants' SCRAM Device relies on transdermal alcohol monitoring, which operates by detecting the amount of alcohol that evaporates through the skin. Because the rate at which alcohol evaporates through the skin is significantly different than the rate at which alcohol is metabolized and detected in the blood stream, transdermal alcohol monitoring requires the use of an algorithm to approximate the blood alcohol content of the wearer based on the amount of alcohol vapor detected at the skin surface.

20.    Because transdermal alcohol monitoring measures the amount of alcohol evaporating through the wearers' skin, the SCRAM Device is by its design susceptible to detecting "false-positive" alcohol readings as a result of what Defendants term to be "environmental alcohol." That is, alcohol vapors that wearer's encounter on an everyday basis that may come in contact with the SCRAM Device.

21.    Environmental alcohols take many forms, and many everyday products contain alcohol that evaporates upon exposure to air and can trigger a SCRAM Device to detect alcohol vapors. For example, body spray, cologne, aftershave, hand sanitizer; household cleaners such as Windex, gasoline, and many other products that most individuals come across on a day-to-day basis contain alcohol that evaporates into the atmosphere.

23.     Given the placement of the SCRAM Device against the wearer's skin
on their or her ankle, and the fact that the SCRAM Device is designed to detect the
presence of alcohol in the air surrounding the wearer, any environmental alcohol
present near or around the device will lead to the device detecting the presence of
alcohol vapors even if the wearer had not ingested any alcohol themselves.

24.     Defendants advertise to the public and the governmental agencies
with whom they seek to work with, that the SCRAM Device is capable of
determining the difference between alcohol vapors that are detected as a result of
"ingested alcohol" and alcohol vapors that are detected as a result of
"environmental alcohol."

25.     Further, the individuals who ultimately purchase Defendants' alcohol
monitoring services, are not in any way informed that the SCRAM Device could
even register any false-positive test results due to environmental alcohol before
making the decision to purchase Defendants' alcohol monitoring service and
submit to monitoring via the SCRAM Device.

26.     However, Defendants misrepresent the risk of false-positive test
results as a result of environmental alcohol. In fact, numerous sources have
documented instances of false-positive test results recorded by the SCRAM Device
when the wearer was proven to have not consumed any alcohol.

27.     For example, in one instance a criminal defendant in Oakland County
Michigan was fitted with the SCRAM Device as a condition of being released on
bond following a car accident. Subsequently, the court was notified of three
drinking episodes that were potential violations of the conditions of the bond, and a
bond revocation hearing was held. However, at the hearing, the Honorable Dennis
Powers of the Novi District Court determined that the SCRAM Device was in fact
unreliable and that the events detected were false-positives. Specifically, according
to the data recorded by the SCRAM Device, during the first drinking episode the
wearer consumed alcohol for 63 consecutive hours and maintained an identical

blood-alcohol level at all times—a biological impossibility. The second drinking episode was detected by the SCRAM Device at the exact same time as when the wearer was taking a breath-alcohol test that showed no presence of alcohol whatsoever. The third drinking episode was detected when the wearer was in the hospital, and even though the wearer had not consumed any alcohol whatsoever, the data recorded was identical to data corresponding to some who had internally ingested alcohol. The court rejected the evidence presented by AMS and in particular noted that "the SCRAM tether did not meet the requisite standards of 'reliability' or 'general acceptance' in the relevant scientific community" and that "[t]he body of evidence supplied by the defendant made it clear that the readings by the SCRAM tether were not necessarily the result of prolonged drinking episodes."

28.    As another example, another criminal defendant was ordered by the Court in Ramsey County Minnesota to wear the SCRAM ankle bracelet as a result of a DUI related offense. The SCRAM device is worn as an ankle bracelet which monitors the migration of alcohol through the offender's skin. The measurements are then obtained are converted to a blood-alcohol content which is designated as the TAC, which means Transdermal Alcohol Content.

29.    In this case, on November 9, 2006, the defendants SCRAM device showed a positive reading for alcohol with a confirmed peak reading .035 TAC. On November 10, 2006, at approximately 6:00 a.m., the defendants SCRAM device showed a positive reading for alcohol with an alleged confirmed peak reading in at .05 TAC. The defendant was notified a week later that he tested positive for alcohol consumption and that a probation violation report would be filed against him. The defendant was notified by their attorney and the defendant got an alcohol test done through a certified medical lab and the results were negative.

30.     In the very case, just as the same facts as each of the Plaintiff's, the Honorable Edward S. Wilson found SCRAM highly unreliable and based on the hearing that was held, the trial Court found that SCRAM was not widely accepted in the scientific community. Further, Judge Edward Wilson also determined that the SCRAM device that the defendant was wearing was not in proper working order on the dates in question. As such, the violation was dismissed.

31.     In a study of the accuracy of transdermal alcohol monitoring utilizing the SCRAM Device, it was similarly noted that the "methodology used by AMS cannot separate ethanol from other contaminating alcohols and therefore is not a reliable method." This is of particular significance because ingested alcohol is specifically comprised of ethanol. Thus, any device intended to measure an individual's blood alcohol content that is not specific to ethanol will detect all types of alcohols, including those that are not ingested by an individual. The SCRAM Device utilizes "fuel cell" technology that creates an electric current when an electrolyte contained within the device comes in contact with chemicals that has a "hydroxyl" group. The chemicals include isopropyl alcohol (rubbing alcohol), antifreeze, and many other "alcohols" such as those previously described above. Because the SCRAM device is not specific to detecting ethanol, any number of other alcohols that are not ingested by the wearer can result in the Device registering an "alcohol" reading if they come in contact with the device.

32.     Because the SCRAM Device does not directly measure the wearers' blood alcohol content, and is not specific to detecting ethanol, a reading by the SCRAM Device detecting the presence of alcohol vapors is not by itself in any way indicative that the wearer had actually consumed alcohol.

33.     As discussed above, Defendants have to apply an algorithm to determine whether any readings collected by the SCRAM Device actually correspond to what Defendants term a "confirmed alcohol consumption event."

34.     Specifically, Defendants measure the rate at which the alcohol vapor readings detected by the SCRAM Device increase and decrease in order in order to determine whether they match the predicted rate at which alcohol vapors are released as a result of alcohol being metabolized by the human body. In applying their algorithm to determine whether an "alcohol consumption event" occurred, Defendants rely on a general assumption that the rate at which alcohol vapor is released through the skin following the consumption of alcohol falls within a certain range for all individuals, regardless of any distinguishing physiological characteristics (i.e. weight, height, thickness of skin).

35.     Applying this algorithm, Defendants claim to be able to distinguish between alcohol vapor readings caused by "alcohol consumption events" and readings caused by "environmental alcohols," because alcohol vapor readings that are caused by environmental alcohols are supposed to have a significantly different rate at which they increase/decrease in comparison to readings that are caused by ingestion of alcohol.

36.     Because the raw data produced by the SCRAM Device is by itself of limited use in determining whether the wearer actually consumed alcohol, the data has to be sent to AMS' central monitoring facility in Colorado to be analyzed and for AMS' personnel to apply the algorithm and attempt to determine whether an "alcohol consumption event" had occurred.

37.     When a customer of Defendants' alcohol monitoring service connects their SCRAM Bracelet into the internet connected docking station each day, the data collected for that day is sent to AMS for such analysis.

38.     If upon analyzing the data AMS determines that the alcohol vapor readings were caused by an "alcohol consumption event," Defendants inform the law enforcement agency or court exercising jurisdiction over the wearer that based on their analysis of the collected data the individual had consumed alcohol.

39.    However, the individual who was actually wearing the SCRAM Device, is not in any way informed by Defendants or by the device itself that an "alcohol consumption event" had occurred, neither at the time when the SCRAM Device is actually recording the alcohol vapor readings, nor when AMS concludes its analysis of the data and informs the law enforcement agency or the court.

40.    In fact, the SCRAM Device is not designed to, and does not actively inform the wearer in real-time when it is detecting alcohol vapors. Even if the SCRAM Device records alcohol vapor readings continuously for 24 hours, when the wearer connects the SCRAM Device to the docking station to upload the data, the SCRAM Device will simply flash a green light to inform the wearer that the upload was successful.

41.    Because the vast majority of Defendants' customers purchase the transdermal alcohol monitoring service as part of a condition of their bond or probation, a report to a law enforcement agency or judiciary that an individual has been determined to have consumed alcohol will often be considered a violation of the conditions of any such bond or probation and trigger a hearing revoking the bond/probation.

42.    However, because Defendants' customers are not timely notified when the SCRAM Device detects the presence of alcohol vapors, when the data is uploaded daily to AMS, or even when AMS sends a report stating that an "alcohol consumption event" has occurred, they often do not discovery that they had supposedly violated the conditions of their bond or probation until several days after the "alcohol consumption event" had occurred.

43.    Thus, Defendants' customers who wish to dispute any finding that they violated the terms of their bond/probation are unable to obtain evidence that could allow them to challenge the revocation of their bond/probation because by the time they are made aware of the potential violation, due to the rate of alcohol metabolism in the human body, Defendants' customers cannot obtain a timely

blood or breath alcohol test that could definitively show that they did not consume alcohol at the time indicated by the SCRAM Device.

## CLAIMS OF CLASS REPRESENTATIVES

### *1.    Roseanne Hansen*

44.    Plaintiff Roseanne Hansen, ("Ms. Hansen or Plaintiff's"), was driving in the City of San Diego when a San Diego Police Department, ("SDPD") officer saw Ms. Hansen in her vehicle and also witnessed Ms. Hansen fail to yield at a known red stop sign. As such, the SDPD officer began following Ms. Hansen for several blocks. The SDPD officer alleges that he witnessed Ms. Hansen commit another traffic offense of failure to yield at a four way stop light.

45.    The SDPD officer then initiated a traffic stop of Ms. Hansen and stopped her in her drive way at her home. The SDPD police officer began asking her several questions. The SDPD officer then became suspicious that Ms. Hansen was under the influence of alcohol. The officer then conducted a Nystagmus check on Ms. Hansen's eyes using his finger. The officer then decided to conduct what is called Standard Field Sobriety Tests, ("SFST's").  The officer alleges that Plaintiff Hansen failed these tests. The officer then had Ms. Hansen do a One-Leg Stand Test by lifting her left foot off the ground. The officer then had Ms. Hansen start counting from 1 to 20.

46.    Thereafter, based on the officer's training, placed Ms. Hansen under arrest for suspicion of driving under the influence. Ms. Hansen was then taken to the station where she was given an option to submit to a breath or blood test. She agreed to a breathalyzer. Due to the facts that the breathalyzer machine was not working at its best, the officer then asked Ms. Hansen for a blood test based on the breathalyzer machine not working correctly. Ms. Hansen then consented to a blood test. After the samples were secured, Ms. Hansen was then transported to the Las Colinas County Jail. Ms. Hansen later posted bail and was released.

PLAINTIFFS' <u>FIRST AMSENDED</u> CLASS ACTION COMPLAINT FOR DAMAGES

47.     Soon after Ms. Hansen was released from the San Diego County Jail, Ms. Hansen was provided with a Court date and Ms. Hansen was then charged with misdemeanor DUI and her and her private retained attorney appeared in San Diego Superior Court and defended against the DUI. As such, Ms. Hansen, by and through her attorney, was later arraigned for misdemeanor DUI. During the course of the criminal case, it was Ms. Hansen voluntarily entered herself in an alcohol treatment center.

48.     After Ms. Hansen entered herself into the treatment facility, on a daily basis, Ms. Hanses was monitored on a daily basis and checked for alcohol. At no time was SCRAM or AMS ever made aware that she was entered into a private rehabilitation center. While Ms. Hansen was entered into the treatment facility, her freedom was strictly regimented. Ms. Hansen was not permitted to leave from the facility, go to work, or consume any form of alcohol.

49.     On February 8, 2016, while living in an alcohol rehab center, AMS had sent a report that to their co-Defendant SCRAM indicating a positive reading that Ms. Hansen consumed alcohol for a day long period. Thereafter, SCRAM, who had ample opportunity to read, investigate and understand the report, then just decided in the best interest of AMS and SCRAM, that the two Defendants would then generate a report that Ms. Hansen consumed alcohol. Again, at no time did SCRAM and AMS know that Ms. Hansen was residing in an alcohol rehab center.

50.     On February 7, 2016, the day before the alleged drinking episode that was paraded around by the Defendants, was a fact that the director of the rehab center where Ms. Hanses was living had given Ms. Hansen a breathalyzer as a part of a random inspection that Ms. Hansen agreed to. The results of the breathalyzer where in fact negative.

51.     After SCRAM and AMS crafted a false violation report pertaining to Ms. Hansen, it was then SCRAM forwarded a copy of the false report to the Court and to Ms. Hansen private attorney. Once the report was filed with the Court and

her attorney, Ms. Hansen was then contacted by her attorney and informed of the false report. Ms. Hansen was then eager to prove her innocence. Ms. Hansen then reported the SCRAM report to her rehab treatment center manager, who again then tested Ms. Hansen on the spot. The results were negative.

52.    That same day, Ms. Hansen's attorney then instructed her to go to a licensed and State approved medical lab to have a urine sample tested. At the lab, Ms. Hansen provided the lab with a urine sample that was ultimately tested not only for alcohol, but also drugs. The results of urine sample were staggering. The results were negative and the State certified lab then sent a copy of their medical report to Ms. Hansen.

53.    Defendants AMS and SCRAM falsely represented to the Court, Judge Lisa Rodriguez, Ms. Hansen's attorney, and Ms. Hansen that she had consumed alcohol for hours at a time. In the end, Ms. Hansen scientifically proved that she did not consume any alcohol and the corrupt Defendants AMS and SCRAM had stated in the false report.

54.    Once Ms. Hansen appeared in Court to defend against the false report, it was then the trial Court did not allow Ms. Hansen to introduce the urine test results. As a result, the Court just decided after reviewing the AMS and SCRAM report that was generated, that Judge Lisa Rodriguez would just extend the period of Ms. Hansen's SCRAM monitoring to an additional year. As a result, this means more money making for Defendants AMS and SCRAM.

55.    As a part of the Defendants money making scheme, it is structured so that when a violation report is generated, the person who is wearing the SCRAM ankle bracelet, will eventually have to appear in Court. When that time comes, both of the Defendants AMS and SCRAM know that most clients do not have the money to prove their innocence by paying $ 300.00 for a urine test, or $ 800.00 dollars for a hair follicle test. Therefore, Defendants AMS and SCRAM do know that ninety nine percent of the judges will then extend the SCRAM period of the

criminal defendant by a year, so that means the criminal defendant must not only be monitored by SCRAM for another year, but it also means that the person who is wearing the SCRAM device now gets to pay AMS and SCRAM another $ 250.00 for SCRAM services every two weeks, and another setup fee in the amount of $ 325.00. Just an everyday money making scheme that the Defendants incorporate by duping every single Judge of the Superior Court of California into actually believing that the criminal defendant actually consumed alcohol when in fact the person has not.

56.    Ms. Hansen paid a total of $ 6,400.00 to Scram of California for the Defendants alcohol monitoring service.

57.    Ms. Hansen paid a total of $ 300.00 for a certified urine test from a certified laboratory.

58.    Additionally, Ms. Hansen also paid $ 2,000 for attorney fees to her attorney to defend against the alleged SCRAM violation.

59.    Had Ms. Hansen known that the SCRAM Device registered false positive test results, did not timely inform the user when the device was detecting the presence of alcohol vapors, and that Defendants AMS and SCRAM would not timely inform Plaintiff once they had determined that an alcohol monitoring event occurred, Plaintiff would have never agreed to purchase Defendants alcohol corrupt monitoring service as a condition of her bond, and would have petitioned the court for an alternative means of monitoring or filed a Writ of Mandate to the Fourth District Court of Appeals asking the Court of Appeals to remand and vacate the SCRAM condition.

### 2.    Jennifer Oh

60.    Plaintiff Jennifer Oh, ("Ms. Oh or Plaintiff's"), was arrested for driving under the influence on December 16, 2014. Ms. Oh was subsequently involved in a car accident with another car. A short time later, police arrived on scene and had opened a crash investigation. During that time, the police suspected

that Ms. Oh was under the influence of alcohol. The investigating officer conducted field sobriety tests on Ms. Oh and alleged that Ms. Oh was in fact under the influence.

61.    Ms. Oh was read her Miranda rights and placed under arrest and then transported to the local police station where Ms. Oh posted bond. The police then provided Ms. Oh with a Court date to appear in Court.

62.    Several months later, Plaintiff retained private counsel and appeared at the trial Court to be arraigned on DUI related charges. At that time, Ms. Oh, by and through her attorney entered a not guilty plea. At the arraignment, her attorney made an offer of good faith to the Court to have Ms. Oh voluntarily enroll in the SCRAM ankle monitoring program.

63.    The criminal case was then postponed to give Plaintiff time to enroll in the SCRAM program. Several weeks later, Ms. Oh's attorney appeared before the trial Court and informed the Court that Ms. Oh enrolled in the SCRAM and AMS program.

64.    While Ms. Oh was enrolled in the SCRAM program, Ms. Oh was then ordered to pay SCRAM $ 225.00 a week for SCRAM monitoring. In addition, the Plaintiff also paid SCRAM a $ 325.00 enrollment fee.

65.    Once Ms. Oh was finally enrolled in the SCRAM program, Ms. Oh was then mandated to attend a seminar which was given by a SCRAM employee. The seminar consisted of the dos and don'ts while on SCRAM. The SCRAM employee instructed the Plaintiff not to consume alcohol. The employee also gave an instruction that Ms. Oh not use any form of alcohol related environmental products. Ms. Oh agreed to both. At no time did SCRAM provide Ms. Oh with any notice of this writing.

66.    During the time that Ms. Oh was placed on SCRAM monitoring, Ms. Oh continued to complain about the monthly SCRAM fee. Ms. Oh also asked the SCRAM Defendant if the Plaintiff could apply to have her monthly costs reduced

1   based on the facts that Ms. Oh could barely afford the monthly fee. However, the

2   employee acting on behalf of SCRAM informed Ms. Oh that she could not seek a

3   reduced rate and that if Ms. Oh, did not pay the monthly fees, that SCRAM would

4   report Ms. Oh to the trial Court indicating that Ms. Oh was in violation of her

5   SCRAM conditions.

6        67.    Facing the threats of arrest and detention and the possibility of losing

7   her job, home and family, Ms. Oh choose to pay the huge fees to SCRAM and

8   AMS.

9        68.    On June 8, 2015, weeks after Ms. Oh complained to her case manager

10  about the outrageous fees assessed by SCRAM and AMS, Ms. Oh's attorney was

11  sent a violation report that Ms. Oh was in violation of her SCRAM monitoring

12  conditions. The alleged times of consumption was June 5, 2015 to June 7, 2015.

13       69.    Defendants AMS and SCRAM indicate that Alcohol detections have

14  confirmed as consumption identify the Blood Alcohol Curve and include both the

15  presence of absorption to the peak with an absorption rate less than 0.10% per hour

16  and the presence of elimination with an elimination rate less than 0.025% per hour

17  if the peak was less than 0.150% or less than 0.035% per hour if the peak is

18  0.150% or above. [Emphasis in original.

19       70.    Also attached to the report generated by AMS to SCRAM, is a graph

20  sheet dated from the dates of June 5, 2015 at 6:00pm to June 7, 2015. The graph

21  shows the trans-dermal concentration, ("TAC") levels just like in the graph of her

22  co-Plaintiff. The TAC readings are the black line and are also represented on the

23  scale sheet to the left of the graph sheet. It also reflects the Infrared, ("IR")

24  readings identified on the blue line and the temperature readings are displayed on

25  the red line and represented by the scale on the right of the graph.

26       71.    The graph is subsequently listed from June 5, 2015 at 6:00pm to June

27  7, 2015.  During these two days, coincidentally, that TAC level stays the same as

28  like her co-Plaintiff Jennifer Oh. Which by all accounts indicated that Ms. Oh

1  drank for two days straight, a biological impossibility. During this time, AMS

2  alleges that the TAC level stayed the same.

3      72.    As a result of a flawed report, Defendant SCRAM sent a report that

4  was generated by AMS to Ms. Oh's private attorney. The report rambles on to

5  indicate that Ms. Oh consumed alcohol on June 5, 2015 for two days.

6      73.    Defendant AMS produced the report and was reviewed by SCRAM,

7  who in turn provided the alleged consumption report to third parties. The report

8  was then sent to the trial Court. Once Ms. Oh became aware of the report and the

9  alleged drinking episode, Ms. Oh's attorney then instructed Ms. Oh to go to a state

10 certified laboratory. Ms. Oh voluntarily submitted to a medical lab, paid $ 300.00

11 to a private testing laboratory and provided a urine sample to have tested. Several

12 weeks later the results of the urine test where made public. The results of the urine

13 test were staggering. The results were negative for alcohol. Also in the sample that

14 Ms. Oh voluntarily provided, the sample was tested for other forms such as the

15 ingredients of alcohol and drugs. However, the certified medical lab was still able

16 to reaffirm that the sample provided by Ms. Oh was still negative. Thereafter, Ms.

17 Oh's private attorney turned over copies of the medical report by the certified lab

18 and a hearing was held.

19     74.    Once the AMS, SCRAM, and lab reports were finalized, Ms. Oh by

20 and through her attorney appeared in the trial Court and defended against the false

21 report allegations. The trial Court was unable to come to a resolution in the case

22 and therefore the SCRAM and AMS Defendants had no choice to face the facts

23 that they produce a false report in a Court of law.

24     75.    Ms. Oh paid a total of $ 600.00 to Scram of California for their said

25 corrupt Defendants alcohol monitoring service.

26     76.    Ms. Oh paid a total of $ 130.00 for a certified urine test from a state

27 certified laboratory.

28

77.     Additionally, Ms. Oh also paid $ 1,000 for attorney fees to her private attorney to defend against the alleged SCRAM violation.

78.     Had Ms. Oh known or been aware that the SCRAM Device registered false positive test results, did not timely inform the user when the device was detecting the presence of alcohol vapors, and that Defendants AMS and SCRAM would not timely inform Ms. Oh once they had determined that an alleged alcohol monitoring event occurred, she would have never agreed to purchase Defendants alcohol corrupt monitoring service as a condition of her bond, or would have tried to locate another AMS and SCRAM monitoring company.

## CLASS DEFINTITIONS AND RULE 23 PREREQUISITES

Plaintiff's brings this action on their own behalf, and also on behalf of the various classes of all other persons similarly situated, pursuant to Federal Rule 23 of the Federal Rules of Civil Procedure.

Numerosity: In accordance with F.R.Civ. P. Rule 23(a), the members of each of the class are so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact number of class members. There are over 50 persons from each of the Scram offices being monitored at any given time, and there is constant change and turnover in who receives a false positive report. The Plaintiffs are informed and believe, and thereon allege, that the number of persons in each of the classes is at least in the hundreds.

## CLASS ACTION ALLEGATIONS

Plaintiffs bring this action pursuant to the Federal Rule of Civil Procedure 23(b) (2) and Rule 23(b) (3) on behalf of themselves and a class defined as follows:

**Nationwide Class**: All individuals nationwide who, from four years prior to the filing of this Complaint through to date of certification purchased Scram and AMS's SCRAM ankle monitoring service.

**California Subclass**: All individuals who, from four years prior to the

filing of this Complaint through to date of certification purchased Scram and AMS's SCRAM ankle monitoring service.

## COMMON ISSUES OF FACT AND LAW

In accordance with F.R. Civ. P. Rule 23(a), there are questions of fact common to the class. The common questions of fact include, but are not limited to the following:

a)      Whether Defendants' Products are able to tell the difference between environmental products that contain, and the presence of actual alcohol in the wearer's body system;

b)      Whether Defendants' disclosed to the Plaintiffs and the class members that environmental products that contain alcohol should not be used;

c)      Whether Defendants unfairly, unlawfully and/or deceptively failed to inform class members that their Products cannot tell the difference between the presence of alcohol and environmental products that contain alcohol;

d)      Whether Defendants misled class members by, *inter alia*, representing that their Products could tell the difference between alcohol and environmental products;

e)      Whether Defendants' advertising and marketing regarding their Products sold to class members was likely to deceive class members or was unfair;

f)      Whether Defendants' and others breached fiduciary duties owed to the Plaintiffs and the Class;

g)      Whether the Defendants' and others breached fiduciary duties owed to the Plaintiffs and the Class:

h)      Whether the Defendants' aided and abetted in the breach of fiduciary duties owed to the Plaintiffs and the Class;

i)      Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

j)      The amount of revenues and profits Defendants received and/or the

amount of monies or other obligations lost by class members as a result of such wrongdoing;

k)      Whether class members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

l)      Whether class members are entitled to payment of actual, incidental, Consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

m)      Whether Defendants practice of waiting two weeks to turn over a violation report to the client violates state law;

In accordance with F.R. Civ. P. Rule 23(a), there are questions of law common to the class. Plaintiffs are informed and believe and thereon allege, that the common questions of law include but are not limited to the following:

a.      Whether the Defendants are making false and misleading statements to City, County and Government agencies to guarantee written contracts;

b.      Whether the Defendants are making known false statements to the Court, Judges, and other agencies that their product is reliable;

c.      Whether the Defendants false products violates State and Federal law;

d.      Whether the Defendants SCRAM Device can be subject to forms of contamination;

e.      Whether the Defendants products have been accepted in the scientific community;

f.      Whether there is a potential error rate;

g.      Whether the conduct described above violates California Business § Professional Codes 17200, 17500;

79.      Typicality:   In accordance with F.R. Civ. P. Rule 23(a), the claims of the representative Plaintiffs are typical of each class. Plaintiffs were subjected to jail time, loss of liberty and loss of thousands in dollars in attorney fees based on the improper conduct of the Defendants.

80.     Thus, the Plaintiffs have the same interests, and have suffered the same type of damages as the class members. Named Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members. Each class member suffered actual damages as a result of the Defendants' discriminatory policies. The actual damages suffered by Plaintiff's are similar in type and amount to the actual damages suffered by each class member.

81.     In accordance with F.R. Civ. P. Rule 23(a), the Named Plaintiffs will fairly and adequately protect the interests of the class. The interests of the Named Plaintiffs are consistent with and not antagonistic to the interests of the class.

82.     Maintence and Superiority:  In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the class would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

83.     In accordance with Fed.R.Civ.P. Rule 23(b) (1) (B), prosecutions of Separate actions by individual members of the class would create a risk of Adjudications with respect to individual members of the class that would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

84.     In accordance with Fed.R.Civ.P. Rule 23(b) (2), Plaintiffs are informed and believe and thereon allege, that Defendants have acted on grounds fully generally applicable to the class.

85.     In accordance with Fed.R.Civ.P. Rule 23(b) (3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. The interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable

PLAINTIFFS' <u>FIRST AMSENDED</u> CLASS ACTION COMPLAINT FOR DAMAGES

to individually prosecute any action at all. The amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. It is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, i.e., the County of San Diego. It will promote judicial efficiency to resolve the several common questions of law and fact in one forum rather than in multiple courts. Because the discrimination alleged herein is systemic, it is particularly well suited to resolution on a class basis, as the critical questions in the case may be answered on a class wide basis.

86.    Plaintiffs do not know the identities of the class members. The Plaintiffs are informed and believes, and thereon allege, that the identities of the class members are ascertainable from SCRAM records, in particular the SCRAM computer systems used to track and identify SCRAM clients. Plaintiffs are hereby informed and believe and thereon allege, that the SCRAM computer records reflect the identities, including addresses and telephone numbers, of the persons who have been using SCRAM Device.

87.    Plaintiffs do not know of any difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues raised on behalf of the classes. The class action will be manageable because so many different records systems exist from which to ascertain the members of the class and to ascertain some of the proof relevant to Plaintiffs' claims. Liability can be determined on a class-wide basis based on class wide evidence because the Plaintiffs' complaint of systemic and widespread defective products and equipment that is manufactured, leased and/or sold by Defendants. Plaintiffs and the class members are entitled to statutory damages under state law and to presumed damages under federal law; and, in any event, individualization or variability in damages is not a bar to a liability certification based on common liability issues.

88.    In accordance with Fed.R.Civ.P. Rule 23(b) (3), class member's must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that SCRAM computer records contain a last known address for class members. Plaintiffs contemplate that individual notices be given to class members at such last known address by first class mail. Plaintiffs contemplate that the notice informs class members of the following:

A.    The pendency of this action, and the issues common to the class;

B.    The nature of the action;

C.    Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.    Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.    Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

Plaintiffs restate and incorporate by reference, each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

## **PLAINTIFFS' FIRST CAUSE OF ACTION**

**(Unfair, Unlawful, Deceptive Trade Practices, Bus. Prof. Code § 17200, et.seq)**

**Plaintiffs on behalf of themselves and the Class v. AMS and SCRAM**

89.    Plaintiffs re-allege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

90.    Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and

continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a.    deceptively representing to Plaintiffs, and those similarly situated, that their products are reliable and can make a determination if alcohol is present in the wearers' system, as opposed to the wearer trying on environmental products that contain alcohol;

b.    failing to adequately inform Plaintiffs, and those similarly situated, that the wearer should not use environmental products;

c.    failing to adequately inform Plaintiffs, and those similarly situated, that the Products did not and were not exclusively made by Scram;

d.    failing to adequately inform Plaintiffs, and those similarly situated, that the Scram device had never been accepted into the scientific community;

e.    failing to inform Plaintiffs, and those similarly situated, that the monthly payment can be lowered, based on the wearer's income;

91.    Plaintiffs and those similarly situated relied to their detriment, on Defendants' unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) the Defendants' Products.

92.    Defendants' acts and omissions are likely to deceive the general public.

93.    Defendants engaged in these unfair practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et. seq.* of the California Business and Professions Code.

94.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitutes unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

95.    Plaintiffs seek, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

96.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

97.    The acts complained of herein occurred, at least in part, within four (4) years preceding the filing of this Class Action Complaint.

98.    Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, and injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled for services not completely rendered. Plaintiffs, and those similarly situated and/or other consumers nationwide have no other adequate remedy at law, to ensure future compliance with the California Business and Professions Code alleged to have been violated

1   herein.

2   99.   As a direct and proximate result of such actions, Plaintiffs and the

3   other members of the Class have suffered and continue to suffer injury in fact and

4   have lost money and/or property as a result of such deceptive, unfair and/or

5   unlawful trade practices and unfair competition in an amount which will be proven

6   at trial, but which is in excess of the jurisdictional minimum of this Court. Among

7   other things, Plaintiffs and the Class lost the amount they paid for the Defendants'

8   Defective Products.

9   100.   As a direct and proximate result of such actions, Defendants have

10   enjoyed, and continue to enjoy, significant financial gain in an amount which will

11   be proven at trial, but which is in excess of the jurisdictional minimum of this

12   Court.

13   <u>**PLAINTIFFS' SECOND CAUSE OF ACTION**</u>

14   **(False Advertising, Bus. Prof. Code § 17500, ET. seq. ("FAL")**

15   **Plaintiffs on behalf of themselves and the Class v. AMS and SCRAM**

16   101.   Plaintiffs re-allege and incorporate by reference the paragraphs of this

17   Class Action Complaint as if set forth herein.

18   102.   Beginning at an exact date unknown to Plaintiffs, but within four (4)

19   years preceding the filing of the Class Action Complaint, Defendants made untrue,

20   false, deceptive and/or misleading statements in connection with the advertising

21   and marketing of their Products, as an example, Defendants state in their false

22   advertising of the product, that "the SCRAM bracelet contains systems designed to

23   test the presence of a positive blood alcohol concentration, by the measurement of

24   alcohol that is being emitted as vapors through the wearer's skin", wrongfully

25   giving the impression that their SCRAM bracelet only reads blood alcohol

26   concentration from ingested alcohol only.  This representation was contained in the

27   Agreement signed between Plaintiffs and the Defendants, SCRAM and AMS.

28   103.   Defendants made representations and statements (by omission and

commission) that led reasonable customers to believe that they were purchasing a product so unique, that it would be proven scientifically that the wearer has, or did at some point consume alcohol. At all times relevant, Defendants' knew that their representations were false, misleading, deceptive and therefore, unlawful, but made them anyways.

104.   Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in each of the paragraphs herein. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' Products, paying less for them or purchasing smaller quantities.

105.   Defendants' acts and omissions are likely to deceive the general public.

106.   Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et. seq.*, of the California Business and Professions Code.

107.   The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

108.   Plaintiffs seek, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

109.   Plaintiffs seek, on behalf of those similarly situated, an injunction to

1  prohibit Defendants from continuing to engage in the false, misleading and

2  deceptive advertising and marketing practices complained of herein. The acts

3  complained of herein occurred, at least in part, within four (4) years preceding the

4  filing of this Class Action Complaint.

5      110.  Plaintiffs and those similarly situated are further entitled to and do

6  seek both a declaration that the above-described practices constitute false,

7  misleading and deceptive advertising, and injunctive relief restraining Defendants

8  from engaging in any such advertising and marketing practices in the future. Such

9  misconduct by Defendants, unless and until enjoined and restrained by order of this

10  Court, will continue to cause injury-in-fact, to Plaintiffs and the general public and

11  the loss of money and property in that the Defendants will continue to violate the

12  laws of California, unless specifically ordered to comply with the same. This

13  expectation of future violations will require current and future customers to

14  repeatedly and continuously seek legal redress in order to recover monies paid to

15  Defendants to which Defendants are not entitled. Plaintiffs, those similarly situated

16  and/or other consumers nationwide have no other adequate remedy at law to ensure

17  future compliance with the California Business and Professions Code alleged to

18  have been violated herein.

19      111.  As a direct and proximate result of such actions, Plaintiffs and the

20  other members of the Class have suffered, and continue to suffer, injury in fact and

21  have lost money and/or property as a result of such false, deceptive and misleading

22  advertising in an amount which will be proven at trial, but which is in excess of the

23  jurisdictional minimum of this Court.

24

25                          **PRAYER FOR RELIEF**

26  WHEREFORE, Plaintiffs Roseanne Hansen, and Jennifer Oh and the Class

27  Members pray for judgment as follows:

28      1.      An order certifying that this case proceed as a Class Action pursuant

-30-
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  | to Federal Rules of Civil Procedure, rule 23;

2  |  2.  Provision of class notice to all members of the Class;

3  |  3.  A declaratory judgment that Defendants have knowingly, intentionally

4  | and maliciously violated state and federal law and each of the provisions;

5  |  4.  An order requiring Defendants to pay restitution of all amounts owed

6  | to the Plaintiffs by the Defendants;

7  |  5.  For general and special damages in an amount according to proof;

8  |  6.  For punitive damages in an amount sufficient to punish Defendants

9  | and deter them from engaging in similar conduct in the future pursuant to Code of

10 | Civil Procedure § 3294;

11 |  7.  An award of reasonable attorneys' fees and costs; and

12 |  8.  An award to Plaintiffs and the Class of such other and further relief as

13 | this Court deems just and proper.

15 | Dated:    May 18, 2017    By:    /S/    Edwin I. Aimufua, Esq.

17 | **JURY TRIAL DEMANDED**

18 | Plaintiffs are entitled to, and demand, a trial by jury pursuant to the Seventh

19 | Amendment to the United States Constitution.

21 | Dated:    May 18, 2017    By:    /S/    Edwin I. Aimufua, Esq.

Edwin I. Aimufua, Esq., SBN # 186986
LAW OFFICES OF EDWIN I. AIMUFUA
17000 Ventura Blvd, Suite # 201
Encino, California 91316
(818) 855-1118 (Telephone)
(818) 855-1101 (Facsimile)
eia@aimufualaw.com

*Attorneys for Plaintiffs Rosanne Hansen,
Jennifer Oh, on their own behalf, and on
behalf of all others similarly situated.*